Stephen L. GOEWEY, a Minor, By His Next Friend, Julie A. Goewey, and Kevin D. Goewey and Julie A. Goewey, Both as Individuals and as Parents of Stephen L. Goewey, Plaintiffs,

v.

UNITED STATES of America, Fluor Daniel Corporation, FD Services, Incorporated, Defendants.

Civ. A. No. 2:92–2543–22.

United States District Court, D. South Carolina, Charleston Division.

May 11, 1995.

---

Wheeler M. Tillman, North Charleston, SC, Michael D. Block, Block, Krockey, Cer-

nugel & Cowgill, P.C., Joliet, IL, for plaintiffs.

John H. Douglas, Asst. U.S. Atty., Charleston, SC, William E. Michael, Judith N. Macaluson, Bridget S. Bade, James C. Brennan, Torts Branch, Civ. Dept., U.S. Dept. of Justice, Washington, DC, for defendant U.S.

Andrew S. Halio, Halio & Halio, Charleston, SC, for defendants Fluor Daniel and FD Services.

## ORDER

CURRIE, District Judge.

This is an alleged toxic tort case resulting from an infant's accidental exposure to a roofing sealant substance.[1] Plaintiffs assert several claims against the United States of America (hereinafter "the USA") under the Federal Tort Claims Act (hereinafter "FTCA"), 28 U.S.C. § 2671 *et seq.* Jurisdiction for the FTCA claims is based on 28 U.S.C. § 1346(b). Plaintiffs also assert several claims against Fluor Daniel Corporation, and its associated company, FD Services, Incorporated, (collectively "FD"). Jurisdiction as to those claims is based on diversity of citizenship, 28 U.S.C. § 1332, as well as ancillary jurisdiction to the FTCA claims.

The matter came before the court for hearing on January 26, 1995, at which all counsel appeared. Nine separate motions were pending, of which three were dispositive motions.[2] The dispositive motions include:

1. The USA's Motion to Dismiss Plaintiffs' Complaint for Lack of Subject Matter Jurisdiction, filed December 7, 1994;

---

1. Although the sealant has been popularly referred to as "tar" in this litigation, in fact, the Lowe's fibered roof coating at issue in this case is not a coal tar product, but rather is a black, asphalt-based petroleum derivative. Defs' Exh. 40, Attach. 2.

2. The court announced the following rulings as to several of the pending motions:

1. Plaintiff's Motion for Leave to Serve Additional Interrogatories on the United States of America, filed December 16, 1994, DENIED;

2. Plaintiff's Motion to Inspect the Premises and Obtain Sample of Tar, filed December 16,

1994, DENIED at hearing. The basis for the court's ruling is addressed below, *supra;*

3. Plaintiff's Motion to File Amended Complaint, filed December 16, 1994, DENIED at hearing. The basis for the court's ruling is addressed below, *supra;*

4. Plaintiff's Motion for Leave to File Response to USA's Opposition to Plaintiff's Motion to File Amended Complaint, filed January 20, 1995, MOOT;

5. Plaintiff's Motion to Cite Additional Authority, filed January 24, 1995, GRANTED.
All other pending motions will be disposed of in this order.

2. FD's Motion for Summary Judgment on the Issue of Medical Causation, filed December 7, 1994;

3. The USA's Motion for Summary Judgment, filed December 7, 1994.

The court has reviewed the voluminous filings,[3] heard argument of counsel, and studied the applicable law. For the reasons given below, the court orders that the USA's Motion to Dismiss is GRANTED, FD's Motion for Summary Judgment is GRANTED; the USA's Motion for Summary Judgment is MOOT, because of the court's dismissal of the claims against the USA on subject matter jurisdiction grounds.[4] The remaining, non-dispositive motion, FD's Motion to Compel, filed January 9, 1995, and taken under advisement at the hearing, is MOOT.

## BACKGROUND

The following facts are drawn from the complete record before the court, including the pleadings, affidavits, depositions, and other materials. Where applicable, all inferences are drawn in Plaintiff's favor.

In 1989, one-year old Stephen Goewey, his parents Julie and Kevin Goewey, and his siblings, resided in U.S. Navy housing located at 73 Lafayette Street, Men Riv Housing Project, Charleston Naval Weapons Station, Goose Creek, South Carolina. In August 1989, Julie Goewey made a routine service call to the Navy's Housing Department requesting that someone fix an apparent water leak in a bedroom. The Housing Department issued a work order to FD Services to "Waterproof above and below ground foundation leak." On two occasions workers for FD Services, a contractor retained by the Navy to perform housing maintenance for the Navy's military housing at that location, responded to the call. The workers applied Lowe's fibered roof coating to the exterior. The workers' customary practice in such cases was to dig a trench down to the foundation and apply roof sealant to the foundation to prevent further water intrusion. They applied sealant to the outer brick wall to a depth of approximately three feet below the ground surface, and several inches above the ground surface. The work was completed by September 5, 1989, and Mrs. Goewey signed off on the worksheet noting the project's completion. Mrs. Goewey knew that some "black stuff", Defs' Exh. 22 at 122, had been applied along the back foundation.

On September 12, 1989, Stephen, his brothers and two other children, were playing in the backyard while Mrs. Goewey was inside the house. Stephen got into a puddle of the sealant, which had exuded from beneath dirt that FD workers had scattered on the ground surface over the sealant. Mrs. Goewey found Stephen sitting on the ground covered in sealant. Although approximately 80–85% of his body was covered in sealant, none was in his mouth, eyes, or ears, and he appeared in no apparent distress. After unsuccessful attempts to remove the sealant with soap and water, Mrs. Goewey had Stephen taken immediately to the Navy Hospital, where the sealant was removed with mineral oil. His skin appeared normal after the tar was removed. For the next few months Stephen appeared perfectly normal and did not require medical treatment other than for a respiratory infection. On January 19, 1990, Mrs. Goewey reported to the Navy Hospital that Stephen appeared to be falling frequently. Plaintiffs contend that Stephen's brief encounter with the roof sealant produced neurotoxic effects of catastrophic proportions, which manifested months after the September 12 event.

Although Plaintiffs have advanced numerous theories of toxic exposure, many of which had been abandoned by the time of the January 26, 1995, hearing,[5] Plaintiff's current pri-

---

**3.** All the parties to this matter inundated the court with filings and exhibits. Pending motions and all supporting material comprised almost three feet of documents.

**4.** Although the court has no subject matter jurisdiction to take up the USA's Motion for Summary Judgment, the court notes that as the USA's Motion is based substantially on the same argu-

ments and evidence relied on by FD in its Motion for Summary Judgment, the court would have reached the same ruling on the USA's Motion, had the court ruled on such motion.

**5.** Plaintiffs' original theory of recovery, repeated throughout the complaint, is that Stephen was injured as a result of his alleged exposures to Chlordane and Heptachlor, which are used in

mary theory of liability is that Stephen was exposed to tri-ortho-cresyl phosphate ("TOCP") through the roof sealant, which caused him progressive neurological impairment. To explain why Stephen did not manifest symptoms of the toxic exposure earlier, Plaintiffs assert that the TOCP compound produced a delayed toxic reaction described as an organo-phosphate induced delayed neuropathy ("OPIDN").

### I. The USA's RULE 12(B)(1) MOTION TO DISMISS

#### A. STANDARD OF REVIEW

■ Plaintiffs bear the burden or persuasion if subject matter jurisdiction is challenged under Rule 12(b)(1). *Williams v. United States of America,* 50 F.3d 299 (4th Cir.1995), *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.), *cert. denied,* 501 U.S. 1222, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991) ("[t]he party who sues the United States bears the burden of pointing to ... an unequivocal waiver of immunity"). In ruling on a Rule 12(b)(1) motion, the court may consider exhibits outside the pleadings. *Williams,* 50 F.3d 299. Indeed, "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* The court's consideration of materials outside the pleadings, such as affidavits, depositions, or live testimony, does not convert the Rule 12(b)(1) motion into a motion for summary judgment. *Adams v. Bain,* 697 F.2d 1213, 1219 (4th Cir.1982).

#### B. DISCUSSION

The parties submitted a voluminous record on the Navy's contract with FD, FD's responsibilities, the Navy's inspection of FD's work, and the repair work executed at Plaintiffs' residence. After examining the record, the court finds the following facts material to the ruling on the USA's Motion to Dismiss.

Federal acquisition regulations permit the Navy to delegate responsibility for family housing maintenance to contractors. Defs' Exh. 3 at 93. Pursuant to industrial study findings showing that the Navy could most economically accomplish this function through delegating family housing maintenance responsibility to a contractor, the Navy delegated responsibility to a contractor such as FD. *Id.*

The maintenance contract at issue here, N62467–86–D–0402, was awarded to FD on September 17, 1986, and was effective from October 1, 1986. The Navy awarded this contract under a so-called "source selection procedure," which is calculated to lower costs, ensure higher quality, and avoid contract administration difficulties. Decl. of Anonie, Defs' Exh. 5 at ¶ 6. Under source selection procedure the Navy may conduct random inspections of the contractors' work, and deduct payments based on the percentage of unsatisfactory work encountered.

Men Riv residents placed work orders by calling the Navy Housing Office. The Housing Office generated a work order ticket. The work ticket contained a description of the complaint. Although the function of the work ticket was not to direct the manner in which FD performed the work, on occasion the ticket might contain a description of the recommended procedure, particularly where, as here, FD had already responded to previous water intrusion complaints by digging a trench and applying roof sealant. FD had ultimate authority to decide what work would be done, and to supervise the necessary work. Defs' Exh. 3 at 74; Defs' Exh. 5 at 8; Defs' Exh. 12 at 21. Importantly, FD employees were instructed not to take instructions from Navy inspectors or Housing Office personnel. Defs' Exh. 18 at 39.

FD Services was required under the contract to "furnish all personnel, supervision, management, equipment, materials, parts, tools, transportation and supplies ..." for the work. Defs' Exh. 6 at §§ C.2 & H.13. FD hired its own workers, who received all employment benefits, compensation, and other benefits from FD. Defs' Exh. 18 at 38; Defs' Exh. 19 at 40.

Several contractual provisions established that FD was responsible for managing the

---

pest control. However, Plaintiffs have abandoned this claim. Similarly, Plaintiffs have abandoned their claim that the Navy Hospital improperly removed the sealant, further contributing to his alleged exposure.

total work product, *see* Defs' Exh. 6, §§ C.2 ("administration, operation, equipment installation, maintenance, repair, alteration and work in the primary functional areas"), C.10 ("the Contractor is responsible for managing the total work effort associated with the maintenance and other services"), C.11 ("Contractor is responsible for implementing all necessary work control procedures to ensure timely accomplishment of work requirements, as well as to permit tracking of work in progress."), H.9 ("Contractor is responsible for planning and scheduling work to assure material and labor is available to complete work requirements within the response times and in conformance with the quality standards established herein").

FD performed quality control tasks whereas the Navy performed some quality assurance tasks. Defs' Exh. 5 at § 8; Defs' Exh. 6 at § C.7 ("it is to be emphasized that the Government's Quality Assurance Program is not a substitute for the Quality Control program implemented and administered by the Contractor"). FD inspectors conducted post-project completion quality control inspections in all cases, Defs' Exh. 7 at 44, whereas the Navy selected only a small random sample of work orders for inspection, which could be done either by visiting the site or telephoning the resident. Defs' Exh. 3 at 79; Defs' Exh. 7 at 33. The Navy employed Contract Surveillance Representatives (CSRs) to inspect the contractors' work. CSRs did not, however, direct or supervise FD workers, and were not usually present when the work was performed. If present, however, their intervention was limited to work situations presenting a dangerous, life-threatening situation. Defs' Exh. 5 at § 8. Otherwise, they had to report unacceptable work to the FD Project Manager. Appointment letters for CSRs, given to CSRs upon hiring, instructed, in part:

> You have no authority to direct or interfere with the methods of performance by the contractor or to issue instructions directly to any contractor or personnel, unless the methods being used present a safety hazard. . . . You are not to tell the

contractor how to perform. . . . In administering the contract, your function is surveillance, not supervision.

Defs' Exh. 5 at Att. A, HW02054–2055.

Following Mrs. Goewey's call concerning the water leak, the Housing Office issued a work ticket to FD to "waterproof above and below ground foundation leak." Defs' Exh. 16. An FD employee repaired the leak on August 30, 1989, by sealing the foundation with roof sealant. Defs' Exh. 14 at 38. No CSRs or other Navy representatives were present. FD supervisors instructed the worker in the application of roof sealant. Defs' Exh. 14 at 59; Defs' Exh. 18 at 43; Defs' Exh. 19 at 42. FD workers paid a second visit to the site on September 5, 1989, in an effort to improve the physical appearance of the foundation. Defs' Exh. 15 at 56. Again, no Navy representatives observed the work, and the workers were supervised by an FD supervisor. A CSR conducted a random telephone inspection of this work order. Defs' Exh. 11 at 10.

■ Plaintiffs' first theory of liability under the FTCA is that the USA is liable for the acts or omissions of its agent or employee, allegedly FD. Plaintiffs attempt to show that Navy CSRs engaged in discussions among themselves and with FD workers as to the solution to the water intrusion problem, and that these discussions somehow constituted specifications to FD as to the manner of performing the work. However, the overall testimony of the witnesses does not support such a conclusion. Defs' Exh. 46, Haynes Depo., at 18, 19, 52–53, 73; Defs' Exh. 48, Harkleroad Depo., at 10–12, 26, 29, 41. Importantly, Plaintiff has not produced any evidence disputing the conclusion that FD employees specifically selected the roof sealant to effect repairs, and it is the sealant which is at the heart of this lawsuit. Defs' Exh. 48, Harkleroad Depo., at 24; Defs' Exh. 14, LeCraw Depo. at 100; Defs' Exh. 15, Anderson Depo., at 58. Nor does the record support a conclusion that CSR Haynes conducted a safety inspection of the site.[6] The

---

**6.** Plaintiffs' response to the USA's Motion to Dismiss contends that Haynes inspected the job on three occasions. They assert that at the first

time he visited the site, Haynes saw a five gallon bucket with tar. The court has reviewed Haynes' testimony and finds numerous inconsistencies.

court finds Haynes' testimony conflicting in many respects, and illustrative of some confusion on Haynes' part as to the occasion on which he attended the site, and what work was being performed. However, even assuming the accuracy of Plaintiffs' version of events concerning Haynes' visit to the site, it is clear that Haynes saw no roof sealant being applied, and his intervention rights were limited to life-threatening situations. Therefore, the undisputed facts establish that Haynes' brief inspection of work was consistent with the full contractual delegation of safety to FD, with a reservation of limited intervention rights only in life threatening situations.

 Where sovereign immunity has been waived, the FTCA allows actions for damages against the United States for injuries caused by tortious conduct of United States agents or employees acting within the scope of their employment. 28 U.S.C. § 1346(b). The FTCA is strictly construed, and all ambiguities are resolved in favor of the United States. *Radin v. United States,* 699 F.2d 681 (4th Cir.1983). Exceptions to immunity are narrow. *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). The limited waiver of the government's sovereign immunity is restricted to acts or omissions of agents or employees of the government. 28 U.S.C. § 2671. The FTCA contains no waiver of sovereign immunity for the acts or omissions of independent contractors. In determining whether an actor is an independent contractor versus an agent of the government, the material consideration is the terms of the contract defining the relationship between it and the United States. *Williams v. United States,* 50 F.3d 299 (4th Cir.1995); *Wood v. Standard Prods. Co.,* 671 F.2d 825 (4th Cir.1982). In this case, FD's classification as an independent contractor or as an agent or employee of the United States is an issue resolved by federal, not state, law.

*Logue v. United States,* 412 U.S. 521, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973).

In *Logue v. United States,* 412 U.S. 521, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973), the Supreme Court noted that the FTCA recognized the distinction between an actor's liability for its own employees' actions, and its non-liability for the actions of a party with whom the employer contracts. *Id.* at 528, 93 S.Ct. at 2219. The distinction turns on the actor's authority to control the physical conduct of the purported independent contractor. Applying that principle, the Court in *Logue* found a state jail an independent contractor of the United States because the United States had "no authority to physically supervise the conduct of the jail's employees." *Id.* at 530, 93 S.Ct. at 2220. Importantly, in *Logue* the Court found that the United States' right to inspect the jail and demand compliance with federal regulations did not transform the jail into an agent of the United States.

Similarly, in *United States v. Orleans,* 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976), the Court reaffirmed the *Logue* test of physical control and held that a community agency funded under a federal act was not a federal agent for purposes of the FTCA. Because no evidence showed the United States had the power to "control the detailed physical performance of the contractor," *id.* at 814, 96 S.Ct. at 1976, the Court found independent contractor status notwithstanding that the United States set specific conditions to implement federal objectives and compelled compliance with federal standards.

In a recent Fourth Circuit case addressing the import of *Logue* and *Orleans,* the court, Judge Hamilton writing, observed:

> Read together, *Logue* and *Orleans* establish the principle that the United States will not be liable under the independent contractor exception of the FTCA by virtue of entering contracts and demanding compliance with federal standards, unless

---

Haynes' account of the work in progress conflicts with the testimony of the workers who performed the job, and his description of his first visit to the site appears to be a visit coinciding with the installation of the french drain (rather than the sealant application). Further, even

Haynes admitted that his memory of the work and inspections at 73 Lafayette was unclear. Defs' Exh. 46 at 44–45. Therefore, the court is unpersuaded that Haynes conducted a safety inspection.

the United States actually supervises the "day-to-day operations" of the endeavor. ... The First Circuit succinctly explained this rubric in opining that "[t]he right to inspect does not nullify the general rule that the government is not liable for torts of independent contractors.".... As we noted previously in *Wood,* determining whether the responsible party was an independent contractor or an agent or employee of the United States hinges on "the primary activity contracted for and not the peripheral, administrative acts relating to such activity."

*Williams v. United States,* 50 F.3d 299 (4th Cir.1995) (citations omitted). The court in *Williams* cited with approval cases finding no governmental liability under the FTCA, even where the United States "[a]cted generally as an overseer," *see Leone v. United States,* 910 F.2d 46 (2d Cir.1990), where the United States "owned and controlled" the premises on which the challenged conduct occurred, *see Larsen v. Empresas El Yunque, Inc.,* 812 F.2d 14 (1st Cir.1986), or where the United States had a significant role in supervising the activities leading to the plaintiff's injuries, *see Kramer v. United States,* 843 F.Supp. 1066 (E.D.Va.1994).

In *Williams,* the plaintiff brought a slip and fall claim against the Government for injuries sustained in the lobby of a federal building. The Government impleaded the third-party defendant Meridian Management Corporation, which had a contract with the United States to perform custodial and maintenance services in the building. In affirming the trial judge's determination that Meridian was an independent contractor, the Fourth Circuit relied primarily on the contractual provisions governing day-to-day maintenance.

In this case, numerous contractual provisions, cited above, provided that FD had sole responsibility for day-to-day maintenance. After exhaustive discovery, Plaintiffs have been unable to put forward any consistent, reliable evidence that day-to-day maintenance was handled by the Navy Housing Office. Accordingly, the court finds *Williams* factually similar, and therefore, legally controlling of Plaintiffs' FTCA claims

based on the negligence of FD. Accordingly, the court holds that FD was an independent contractor, and thus the United States was not liable for FD's alleged tortious conduct. Any allegations of such tortious conduct are dismissed pursuant to Rule 12(b)(1).

Plaintiffs' second asserted basis of FTCA liability challenges the Navy's decision to delegate responsibility for maintenance to FD. Plaintiffs' also challenge the USA's decisions regarding the Navy's inspections, and assert that the Navy failed to inspect its contractor's work properly, or failed to give adequate warning of the open trench danger, which Plaintiffs suggest one Navy employee, Haynes, observed. The court finds both asserted bases of liability barred by the discretionary function exception to the FTCA.

The discretionary function exception to the FTCA, 28 U.S.C. § 2680(a), provides that the United States is not liable for:

any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

In *United States v. Gaubert,* 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991), the Court stated the test for application of the discretionary function exception. First, the exception will apply only to those acts or omissions that are discretionary in nature. Thus, if the conduct is prescribed by statute or regulation, the exception is inapplicable. Second, the exception protects only those actions based on considerations of public policy.

In *Williams* the Fourth Circuit found that the discretionary function exception barred plaintiff's claims that the USA was negligent in engaging the contractor, in inspecting the premises, and in failing to post warning signs when it knew of the floor's dangerous condition. The court found both prongs of the *Gaubert* test satisfied, in that no prescribed course of conduct governed engaging mainte-

1278

nance services, and that the Government's decision to engage the contractor was grounded in policy because the Government had balanced the competing needs and expenses of such proposal. Furthermore, the court in *Williams* also found the plaintiff's allegations concerning negligent inspection and failure to post warning signs precluded by the discretionary function exception because "these decisions are embraced by the overarching decision to engage [the contractor]." *Id. See also Kiehn v. United States,* 984 F.2d 1100, 1103 (10th Cir.1993) ("[t]he decision whether or not to post warning signs ... is clearly discretionary as it involves an element of judgment or choice.").

■ Plaintiffs in the present case argue three similar bases for relief. Applying these factors to the present matter, the court finds that the United States' decision, through the Navy, to delegate responsibility for maintenance to FD is the type of governmental, discretionary, policy-based decision-making that the discretionary function exception removes from liability. First, the Navy's delegation of responsibility for maintenance services here, as in *Williams,* is not prescribed by statute or regulation. Rather, the Federal Acquisition Regulations (FARs) do not prescribe a course of conduct, but impart to the USA discretion to exercise judgment in the choice of maintenance contractors. Second, the decision to engage FD was grounded in policy because in contracting with FD the United States, relying on industrial studies, balanced the competing needs and expenses of engaging a contractor. Thus, the Navy's decision was based on economic policy considerations involving the best allocation of Navy personnel and resources. Defs' Exh. 3 at 93–94. Accordingly, any allegation by Plaintiff that the USA was negligent in engaging FD is barred by the discretionary function exception.

■ Plaintiffs' claim that the Navy's inspection or failure to post signs were negligent is barred by the same exception. *See, e.g., Childers v. United States,* 40 F.3d 973 (9th Cir.1995) (discretionary function exception protects the Government's decision regarding placing signs on trails in National Park). Under the contract, FD provided

maintenance to over 2,000 housing units, generating about 4,000 service calls a month. The Navy did not have personnel or resources to conduct inspections of all calls. Defs' Exh. 5 at Para. 9; Defs' Exh. 7 at 89; Defs' Exh. 8 at 45; Defs' Exh. 11 at 17. Plaintiffs have failed to establish that any federal statute or regulation controls how the Navy should supervise its contractors, which necessarily leaves the matter one of judgment, or discretion, by the government. Moreover, the Navy's random inspection procedure, which is part of the source selection procedure, grew out of an economic policy-based decision to preserve government personnel and finances. Accordingly, the court finds the *Gaubert* factors satisfied. Those portions of Plaintiffs' claims based on alleged negligent inspection or failure to warn are, as in *Williams,* barred by the discretionary function exception.

In sum, therefore, the court finds all of Plaintiffs' claims under the FTCA barred under either the independent contractor exception or the discretionary function exception. Accordingly, all claims against the USA are dismissed.

## II. RULE 56 MOTION FOR SUMMARY JUDGMENT BY FD

### A. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). It is well-established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties,* 810 F.2d 1282 (4th Cir.1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.,* 369 U.S. 654,

82 S.Ct. 993, 8 L.Ed.2d 176 (1962). When the defendant is the moving party and the plaintiff has the ultimate burden of proof on an issue, the defendant must identify the parts of the record that demonstrate the plaintiff lacks sufficient evidence. The non-moving party, here Plaintiff, must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A dispute about a material fact is not "genuine" unless the evidence taken as a whole is such that a rational jury could return a verdict for the opposing party. *Id.* While a party opposing summary judgment is entitled to all reasonable inferences in its favor, an inference is only reasonable if it is plausible and the evidence is such that a rational jury, given the entire record, could draw that inference. *Id.* The trial court should grant summary judgment against a party who has failed to make a showing sufficient to establish the existence of an essential element of the party's case, and upon which that party bears the burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

## B. DISCUSSION

FD moves for summary judgment on the grounds that Plaintiffs have failed to produce any reliable evidence of a causal connection between Stephen Goewey's brief contact with the roof coating on September 12, 1989, and his subsequent development of progressive neurological impairment. FD argues that it is entitled to summary judgment on two independent grounds. First, FD contends that Plaintiffs' medical testimony on the causal connection is so uncertain, conflicting and speculative that it fails to satisfy the required degree of certainty for admission into evidence and, therefore, summary judgment is appropriate. In addition, FD contends that when this court performs its "gatekeeping role" as to the admissibility of Plaintiffs' expert testimony, *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* — U.S. —, —, 113 S.Ct. 2786, 2798, 125 L.Ed.2d 469 (1993), it will be apparent that Plaintiffs' case rests on unproven methodology, unfounded assumptions, erroneous data, conjecture and

speculation. Accordingly, FD contends that such expert testimony fails to meet the twin *Daubert* objectives of relevancy and reliability and, therefore, would be barred at trial.

As to FD's first argument regarding the speculative nature of Plaintiffs' expert testimony, the following principles apply. Under South Carolina law, a plaintiff in a negligence action has the burden of proving that the injury was caused by the actionable conduct of the particular defendant. *Ryan v. Eli Lilly & Co.,* 514 F.Supp. 1004 (D.S.C. 1981). Where a medical causal relation issue is not one within the common knowledge of the layman, proximate cause cannot be determined without expert medical testimony. *Ellis v. United States,* 484 F.Supp. 4 (D.S.C. 1978). Expert testimony is admissible on the question of a causal connection between the plaintiff's injuries and the acts of the defendant only if the expert testifies that, taking into consideration all data, it is his professional opinion that the result in question "most probably" came from the cause alleged. *Baughman v. American Tel. & Telegraph,* 306 S.C. 101, 410 S.E.2d 537 (1991) (in suit by property owners against refinery operator for injuries from alleged pollution, Supreme Court affirmed grant of summary judgment where trial judge found expert's opinion did not satisfy the required causal showing of "most probably").

Second, with respect to FD's argument concerning the lack of reliability of Plaintiffs' expert evidence, the following principles apply. An expert may only testify about "scientific, technical, or other specialized knowledge" that "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid.P. 702. The Supreme Court indicated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* — U.S. —, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), that to qualify as scientific knowledge that assists the trier of fact, scientific evidence must be "reliable." *Id.* at —, 113 S.Ct. at 2795. To gauge reliability, trial courts should take into account, *inter alia,* whether the evidence has been published and subjected to peer review, whether it has been tested and verified, whether its rate of error is high,

and whether it has been generally accepted in the scientific community. *Id.* at ——, 113 S.Ct. at 2796–97.

As noted above, Plaintiffs' current theory of liability is of an acute toxic exposure to the organo-phosphate known as tri-ortho-cresyl phosphate (TOCP), a compound which produces a delayed toxic reaction known as "OP-IDN," an organo-phosphate induced delayed neuropathy. To prove causation by FD, Plaintiffs rely on the testimony of the following expert witnesses:

(1) Lorne K. Garrettson, M.D. (treating physician);

(2) Mohamed Abou–Donia, Ph.D. (research scientist);

(3) Robert K. Simon, Ph.D. (chemist, toxicologist);

(4) Peter G. Bernad, M.D. (neurology);

(5) David Hartman (neuropsychologist).

The following is a summary of the testimony offered by each of those witnesses.

■■■ (1) Dr. Garrettson, an associate professor of pediatrics at Emory University School of Medicine, is a treating physician from whom Plaintiffs seek expert opinion on causation. Dr. Garrettson considered several possible toxic exposures that could account for Stephen's condition, including chlordane (pesticide) poisoning, roof coating, TOCP, and chlorpyrifos (pesticide). After dismissing several of those theories, Dr. Garrettson opined that Stephen was probably poisoned by TOCP. Dr. Garrettson admitted that TOCP is not normally in roof coating, and would have had to have been added in the present case. In fact, the FD workers involved in applying the roof coating to the foundation of the Goewey residence testified that they did not add anything to the roof coating used to seal the foundation of the house. Defs' Exh. 14 at 106; Defs' Exh. 15 at 120. Dr. Garrettson admitted that he has no actual knowledge that TOCP was added to the sealant, and that this theory was only a "possibility." Defs' Exh. 39 at 76. In addition, the manufacturer of the sealant used in this case, Monsey Products Co., has never used TOCP as an ingredient in its sealant, Defs' Exh. 40.

After reviewing his testimony, the court finds Dr. Garrettson's opinion is not sufficiently definite under *Baughman* to be admissible. Dr. Garrettson posited four separate theories of causation, only one of which (TOCP) could result in liability for FD. Even if Dr. Garrettson's testimony can be construed as advocating TOCP as the leading suspect or culprit, Plaintiffs have failed to adduce any evidence that TOCP was in the roof sealant. In fact, all the evidence points to a contrary conclusion. Accordingly, Dr. Garrettson's opinion on TOCP exposure is based on theoretical speculation and a fact not in evidence (i.e., that TOCP was in the sealant).

(2) Dr. Abou–Donia is a research scientist who is engaged in research on adult chickens in order to study the delayed onset (OPIDN) of the neurotoxic effects of TOCP exposure. He does no work on humans, and performs strictly laboratory research. Based on a blood test he administered to Stephen, which had never previously been administered on a human, Dr. Abou–Donia opined that Stephen's blood was consistent with a degenerative neurological process, such as that caused by exposure to TOCP.

■■■ Dr. Abou–Donia's opinions on the neurotoxic effect of TOCP in humans is extrapolated from his work on TOCP exposure in chickens and his study of literature of human cases. Even if one credits as scientifically sound his extrapolations from fowl to human, his laboratory work indicates that the latency period for TOCP exposure in chickens is from 6 to 14 days, and in humans it is a matter of weeks, not months. Here, Stephen did not begin manifesting symptoms of disease until several months after the September 12 incident, a fact which would militate against a finding of TOCP exposure on September 12. Thus, Dr. Abou–Donia's own research on the results of TOCP poisoning do not support a finding of TOCP exposure on September 12. Moreover, the court finds no scientific credibility in the test of Stephen's blood performed for the purpose of detecting phosphorylated neurofilaments. Again, Dr. Abou–Donia's conclusions are extrapolated from his work on chickens. Because the test has never been performed on a

human before, has not been published or exposed to peer review, and has been criticized by another one of Plaintiffs' experts, Dr. Bernad, Defs' Exh. 42 at 202–203, it cannot meet the threshold test of reliability under *Daubert* and therefore, may not be considered probative of causation.

■ (3) Dr. Robert K. Simon is a scientist who considers himself an expert in industrial hygiene, chemistry, toxicology, pesticides, and other areas. He was initially retained by Plaintiffs' counsel to test the 71 and 73 Lafayette residences for pesticides, which, as noted earlier, was Plaintiffs' original theory of liability. After his survey, Dr. Simon initially felt pesticides were the culprit, although he later shifted that opinion to TOCP exposure after receiving some reading materials from another of Plaintiffs' experts, Dr. Hartman. Although Dr. Simon attempted to analyze a shirt worn by Mrs. Goewey on the day of the incident for trace elements of TOCP, his results were inconclusive, Defs' Exh. 44 at 1–2 ("while both methods indicated that TOCP could be present, the trace quantities found in each method, and the presence of potential interfering substances, . . ., have decreased our confidence in the result.")

The court notes at the outset that Dr. Simon is not a physician, or one trained in diagnosing patients. The Sixth Circuit Court of Appeals has affirmed one district judge's refusal to admit Dr. Simon's opinions on the issue of medical causation. *Conde v. Velsicol Chem. Corp.*, 804 F.Supp. 972 (S.D.Ohio 1992), *aff'd,* 24 F.3d 809 (6th Cir.1994). Similarly, in this case, Dr. Simon is unable to cite any specific scientific or medical literature to support his assertions that Stephen's symptoms are consistent with toxic exposure. The methodology of his test performed on the shirt Mrs. Goewey had been wearing on the day of the incident (which test was performed after the shirt had already been laundered several times) is not sufficiently reliable to be admissible on the issue of causation.

■ (4) Dr. Peter Bernad is a neurologist who has worked in the field of insecticides and pesticides. He admitted the present case was a difficult one to diagnose. Defs' Exh. 42 at 188. Although Dr. Bernad is unable to point to any one chemical as the cause of Stephen's problems, he proposes a theory of a "hypoxic ischemic event" in which he speculates that Stephen was "asphyxiated." Defs' Exh. 42 at 75, 125. However, he acknowledges that if Stephen's face was not actually in the sealant, but he merely put some sealant on his face by playing with his hands, then the asphyxiation theory was invalid. In the present case, the undisputed evidence, including the evidence of Mrs. Goewey, is that Stephen got the sealant on his face by touching it with his hands. J. Goewey Depo. at 261. Stephen was found sitting up in the sealant, alert, oriented and breathing normally. Thus, there is absolutely no evidence to support Dr. Bernad's "hypoxic ischemic event," and Dr. Bernad flatly rejects the contention that Stephen's condition is consistent with TOCP exposure. Defs' Exh. 42 at 105.

The court finds Dr. Bernad's testimony insufficiently definite to constitute reliable evidence on causal connection. His testimony is speculative and conjectural, and his "conclusions," to the extent he makes any, are based on facts not supported by the record. Accordingly, Dr. Bernad's testimony would not be admissible under Rule 702 and may not provide evidence of causation.

(5) Dr. David Hartman, a neuropsychologist, has been retained by Plaintiffs as a "wrap up" expert to provide an "overview" of the other experts' testimony. Dr. Hartman testified in terms of four "possibilities" for Stephen's condition, including "tar," "TOCP," a "phradine compound", or a "toxic soup kind of a compound." Defs' Exh. 60. The problem with Dr. Hartman's theory is that it focuses primarily on chemicals not found in the sealant at issue in this case.

■ For example, Dr. Hartman's theory of pyridines exposure in the tar will not survive *Daubert* analysis. The research that purports to establish a connection between pyridines exposure and certain disorders of the nervous system (chiefly Parkinson's disease), consists of a handful of articles and is based on experimental studies injecting MPTP, a pyridine derivative, into potatoes

and mice. In the first place, it should be noted that Stephen has never manifested Parkinson's-like symptoms, and therefore, the relevancy of any pyridines-Parkinson's connection is absent in this case.

■ Dr. Hartman's attempt to unite the proposed different possibilities of causation postulated by Plaintiffs' experts under one umbrella by insisting that they "are really saying one thing over all" is insufficient to establish causation under *Baughman.* What is obvious is that significant inconsistencies appear among Plaintiffs' experts' testimony. Where so many inconsistencies emerge from one side, the court must conclude that Plaintiffs are merely speculating as to causation.

■ The court cannot reconcile Dr. Garrettson's TOCP theory with Dr. Bernad's statement that Stephen's condition is not consistent with exposure to TOCP "from a neurologic point of view." Defs. Exh. 39 at 105. Nor can the court reconcile Dr. Bernad's hypoxia theory with Dr. Hartman's opinion that no behavioral data or clinical evidence supported the hypoxic theory. Defs. Exh. 60 at 344–347. Finally, the court cannot reconcile Drs. Garrettson and Bernad's admissions that nothing known to exist in the tar could cause Stephen's problems with Dr. Hartman's testimony that the tar contains pyridines that could have caused the problem. To allow Plaintiffs to cumulate their mutually contradictory conclusions to equal a "more likely than not" explanation would be unjust. Where expert testimony is relied upon to link physical injury to causation, the witnesses' testimonies may not contradict each other on essential points. *Dill v. Scuka,* 279 F.2d 145, 147–48 (3d Cir.1960). The rationale behind such a policy is that the fact finder should not be required to guess between contradictory conclusions.

■ As further support for the court's determination that Plaintiffs have failed to carry their burden of proof on causation, the court notes that Plaintiffs have not only failed to produce evidence that establishes their theory or multiple theories of liability, but have also failed to rule out all other inconsistent conclusions. For example, medical testimony establishes that Stephen has a condition the cause of which is unknowable between 40–50% of the time. Defs' Exh. 61 at 145; Defs' Exh. 62 at 60; Defs' Exh. 63 at 56; Defs' Exh. 64 at 18–19. The scientifically unreliable evidence offered by Plaintiffs, which in itself is contradictory, cannot overcome the conclusion that Stephen's condition is one ascribed as etiology unknown, as numerous treating physicians have concluded, Defs' Exhs. 31 at 22 (Stearns, Navy neurologist) (Stephen diagnosed as having "progressive ataxia of undetermined etiology"); Defs' Exh. 32 at 36 (Morales, Bethesda Naval Hospital) (unknown etiology); Defs' Exh. 34, (DeLong, Pediatric Neurology, Duke University Medical Center) (progressive diplegia of unknown etiology); Defs' Exh. 36 at 38, (Barbosa, Director of Pediatric Neurology, Medical University of South Carolina) (no known cause of Stephen's neurological illness and it is not uncommon to find patients who present with a neurologic disease process that has no known cause). While all these treating physicians were informed of the September 12 incident, not one thought it the likely cause of Stephen's problems, several resoundingly rejected the notion, and Dr. DeLong, Chief, Division of Pediatric Neurology, at Duke University Medical Center "reviewed the world's literature, including a Medline search, and have not found anything that would be similar to Stephen's condition." Defs' Exh. 33 at 34.

The court's determination above that Plaintiffs' experts fail to produce reliable evidence of causation is reinforced by a recent Fourth Circuit case. In a case markedly similar to the present, *Carroll v. Litton Systems, Inc.,* 45 F.3d 809 (4th Cir.1995), the plaintiffs, persons who had obtained their drinking water from private wells, brought a claim against a manufacturer who had allegedly contaminated with trichloroethane (TCE) groundwater at a plant site and surrounding wells between 1967 and 1974. On the manufacturer's motion for summary judgment, the district judge concluded that the testimony of the plaintiffs' expert Moore that defendant's TCE entered the residential wells in 1970 was inadmissible under Rule 702. Further, the district judge also found inadmissible the plaintiffs' expert Spencer's testimony on the amount of TCE in plaintiffs'

wells since 1970. The court granted summary judgment. The Fourth Circuit affirmed the district judge's rulings on those issues. In finding Moore's testimony unreliable, the Court of Appeals noted that the expert's opinion was not based on any evidence that TCE had seeped into the wells in those years. With regard to Spencer's testimony concerning the concept of environmental half-life for TCE, the court noted that his approach was rejected by his peers, and subject to an extremely high rate of error. Accordingly, the court concluded that the testimony of both witnesses, as well as the testimony of three physicians who relied, in part, on Spencer's calculations, was not sufficiently reliable.

### III. PLAINTIFFS' MOTION TO INSPECT PREMISES AND OBTAIN SAMPLE OF TAR

■ The present case is one of the oldest cases on the court's docket and has previously been the subject of numerous scheduling order extensions. Pursuant to the court's Amended Scheduling Order, filed August 12, 1994, discovery was to be completed no later than November 15, 1994, and the cut-off date for filing dispositive motions was set as December 7, 1994. On December 16, 1994, one week after the USA and FD's dispositive motions (addressed above) had been filed, and almost two months after first learning of the possibility of tar remaining in the ground at the former Goewey residence, Plaintiffs moved to be allowed to dig a trench on the subject site and obtain a tar sample. Plaintiffs' brief states that at the deposition of Ray Lee on October 18, 1994, Plaintiffs first learned that tar at 73 Lafayette had been removed only to the level of a french drain, and that therefore, some tar might still be in the ground. Plaintiffs hoped to have their retained expert, Dr. Simon, a chemist (addressed above), conduct testing for TOCP traces. Defendants opposed the testing.

Although the court might have been more sympathetic to Plaintiffs' request had it been submitted on a timely basis after Plaintiffs first learned of the possible remaining tar on October 18, 1994, the court must deny the request at this late stage. The court has

several reasons for denying Plaintiffs' motion.

The first reason is that Plaintiffs have waited too long. The dilatoriness attached to Plaintiffs motion, and the disruption and prejudice such testing would cause to the parties and court's calendar are significant considerations, especially in an aged case. After Plaintiffs had reviewed Defendants' dispositive motions, and presumably seen the weaknesses in their causation evidence, Plaintiffs sought to re-open discovery and collect evidence to buttress their TOCP theory. To allow Plaintiffs to conduct further testing now would delay the court's ruling on the nearly three feet of pending motions, including the dispositive motions, and would necessitate a continuance of this case beyond the scheduled May 1995 term of court.

■ A scheduling order is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril. *Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604, 610 (9th Cir.1992). Although the court would be justified in denying Plaintiffs' motion on this basis alone, the court also finds the motion meritless because the proposed tar testing is inherently suspect.

The sample of tar, if, indeed, any is to be found, cannot provide scientifically reliable and legally relevant data at this time. Any tar remaining in the ground for five years has been subjected to environmental degradation, including Hurricane Hugo. Expert testimony, *see* Exh. 1 & Exh. 2, FD's Memo In Opposition to Plaintiffs' Motion to Inspect Premises and Obtain Tar Sample, establishes that a reliable sample would need to be in a well-closed container, unexposed to the environment. Plaintiffs intend to have Dr. Simon, the chemist previously found by the court to be unqualified to testify as to medical causation, analyze the sample. Dr. Simon proposes to use gas chromatography, a testing method he previously used on Mrs. Goewey's shirt. In that case, the results of TOCP traces were inconclusive. Test results on a five-year old unpreserved tar sample that has withstood time, the elements, and a hurricane, could scarcely be more reliable than the earlier test of the shirt, or present

less rate of error. The court concludes the proposed testing would not be sufficiently reliable to pass muster under *Daubert* and therefore, Plaintiffs' Motion to Inspect Premises and Obtain Tar Sample is denied.

## IV. PLAINTIFF'S MOTION TO AMEND

■ Rule 15(a) of the Federal Rules of Civil Procedure provides that after a responsive pleading has been served, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." However, leave to amend should be denied on the ground of futility when the proposed amendment is clearly insufficient because of substantive or procedural considerations. *Davis v. Piper Aircraft Corp.*, 615 F.2d 606, 613 (4th Cir.), *cert. dismissed*, 448 U.S. 911, 101 S.Ct. 25, 65 L.Ed.2d 1141 (1980); *McDermott, Ltd. v. Moretz*, 898 F.2d 418, 421 (4th Cir.1990) (upholding district court's refusal to allow amendment asserting fraudulent misrepresentation counterclaim because it would have been subject to dismissal under Rule 12(b)(6)). A motion to amend may be denied based on "a showing of prejudice, bad faith, futility, or dilatoriness associated with the motion." *Sandcrest Outpatient Serv. v. Cumberland County Hospital*, 853 F.2d 1139, 1148 (4th Cir.1988).

■ Again, the court notes that this is one of the oldest cases on this court's docket. Because Plaintiffs' theory of recovery has changed repeatedly through the discovery process, Plaintiffs' Complaint still contains many abandoned theories of recovery. As long ago as October 8, 1993, counsel for the United States requested that Plaintiffs amend their complaint to reflect their changing theories and allegations. *See* Declaration of J. Brennan, Attach. A, USA Oppo. to Pltfs' Motion to Amend Complaint. Although Plaintiffs' counsel acknowledged the need to update the complaint, one year later, on October 17, 1994, Plaintiffs' counsel still had not done so and represented that Plaintiffs would be amending their complaint shortly. On December 6, 1994, the USA served its Motion for Summary Judgment and Motion to Dismiss for Lack of Subject Matter Jurisdic-

tion. Nine days later, on December 15, 1994, Plaintiffs served their Motion to File Amended Complaint. The court has now had opportunity to review the Proposed Amended Complaint and finds that it contains rambling, disjointed and unrelated allegations, some of which have no apparent factual or legal foundation and would be subject to dismissal on motion of Defendants.

As to the proposed amendments affecting the USA, Plaintiffs are attempting to circumvent the USA's Motion to Dismiss by alleging that FD Services was the USA's agent, not an independent contractor. In addition, Plaintiffs are attempting to assert a claim against the USA for spoliation of evidence, which has never been recognized under South Carolina law. Plaintiffs' attempt to amend their complaint now, after the USA has filed its dispositive motions, appears to be an eleventh hour attempt to evade a grant of summary judgment by grasping at new legal theories. Moreover, these newly developing theories are not based on newly discovered evidence or intervening facts.

■ Similarly, with respect to the proposed amendments affecting FD, Plaintiffs seek to assert breach of warranty and strict liability claims. Because FD was in the business of providing maintenance services to the Navy, and did not manufacture the roofing sealant, no "sale of goods" occurred sufficient to trigger the warranty provisions of the Uniform Commercial Code, S.C.Code Ann. §§ 36–2–314 and 36–2–315; *Henderson v. Gould*, 288 S.C. 261, 341 S.E.2d 806 (Ct.App.1986); *Computer Servicenters, Inc. v. Beacon Mfg. Co.*, 328 F.Supp. 653 (D.S.C.1970), *aff'd*, 443 F.2d 906 (4th Cir. 1971) (contract for performance of data processing services not a sale of goods). Moreover, the proposed strict liability claim is equally meritless, because not a shred of evidence exists that FD injected the product into the stream of commerce, as required, *Henderson*, 341 S.E.2d 806, or that FD is a seller "engaged in the business of selling such a product," S.C.Code Ann. § 15–73–10(1)(a). Accordingly, the proposed amendment would be subject to dismissal.

Similarly, Plaintiffs' attempt to assert a prejudgment interest claim is not cognizable in cases of unliquidated damages, *Republic Textile Equipment Co. of South Carolina, Inc. v. Aetna Ins. Co.*, 293 S.C. 381, 360 S.E.2d 540 (Ct.App.1987). In addition, Plaintiffs' Proposed Amended Complaint injects phrases like "carcinogenic .. properties" although there is a total absence of any evidence in the case that Stephen Goewey has cancer or an increased risk of cancer as a result of his exposure to any substance. Rather, all of Plaintiffs' theories to date have alleged neurological injury, and therefore, idle references to carcinogens and cancer appear to be utterly without foundation in the record and simply inserted for dramatic effect. In an analogous situation, the Fourth Circuit noted that the plaintiffs' motion to amend their complaint "followed on the heels" of the defendants' motion for summary judgment and appeared "to have been an afterthought by [plaintiff], possibly prompted only by the concern that it would lose on the summary judgment motion." *Sandcrest*, 853 F.2d at 1149. In the case at hand, the court finds that Plaintiffs' Motion to Amend Complaint should be denied based on Plaintiffs' dilatoriness and on the futility of permitting amendments that would be subject to dismissal as a matter of law. Accordingly, for these reasons, the court denies Plaintiffs' Motion to Amend Complaint.

## CONCLUSION

Based on the foregoing reasons and the cited authorities, the USA's Motion to Dismiss is GRANTED; FD Services, Inc. and Fluor Daniel, Inc.'s Motion for Summary Judgment is GRANTED; Plaintiffs' Motion to Inspect Premises and To Obtain a Tar Sample is DENIED; Plaintiffs' Motion to Amend is DENIED; all other motions are moot. The Clerk is directed to enter judgment for Defendants.

IT IS SO ORDERED.