Daniel PLOURDE, et al., Plaintiffs,

v.

Walter GLADSTONE, et al., Defendants.

No. 1:00–CV–194.

United States District Court, D. Vermont.

March 20, 2002.

400 (Mo.App.1988); *Cruz v. Liberty Mut. Ins. Co.*, 119 N.M. 301, 889 P.2d 1223, 1226 (1995); *Cianci v. Nationwide Ins. Co.*, 659 A.2d 662, 670 (R.I.1995).

R. Bradford Fawley, Downs, Rachlin & Martin, Brattleboro, VT, for Plaintiffs.

Richard P. Foote, Conley & Foote, Middlebury, VT, for Walter Gladstone.

Harry R. Ryan, III, Ryan, Smith & Carbine, Ltd., Rutland, VT, for Craig W. Trischman and Twin State Fertilizer.

### RULING ON DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF DR. ROBERT K. SIMON

(Paper 116)

MURTHA, Chief Judge.

Before the Court in this toxic tort action is a motion by Defendants Walter Gladstone, Craig W. Trischman, and Twin State Fertilizer, Inc. to exclude the expert opinion testimony of Dr. Robert K. Simon. For the reasons explained below, Defen-

dants' motion is GRANTED with respect to Dr. Simon's proffered testimony on the issue of injury causation.

## I. *Background*

From 1997 through 2001, Plaintiffs Daniel and Margaret Plourde lived with their two children, Andre and Daniele Plourde, on their 25–acre dairy farm in North Haverhill, New Hampshire. Walter Gladstone, a resident of Bradford, Vermont, owns 140 acres of farmland located to the immediate west and upwind of the Plourde farm.[1] Gladstone uses his land to grow silage (feed) corn and pumpkins. Defendant Craig Trischman is the owner of Defendant Twin State Fertilizer, Inc., a Vermont corporation that applies fertilizers, herbicides, and pesticides for area farmers, including Gladstone. This dispute arises primarily from two herbicide spraying episodes during the growing seasons of 1999 and 2000.

### A. *Herbicide Applications*

#### 1. *1999*

During four days in May and early June of 1999, Trischman applied the herbicide Command® 4EC to approximately 80 acres of Gladstone's pumpkin crop. The active ingredient in Command® 4EC is clomozone. On May 31, 1999, Trischman sprayed two herbicides—Prowl® 3.3EC and Bicep II®—on approximately 14 acres of silage corn crop. The active ingredient in Prowl® 3.3EC is pendimethalin, and the active ingredients in Bicep II® are atrazine and simazine.

Also during 1999, Gladstone hired Northeast Agriculture—a non-party in this case—to apply agricultural chemicals to his fields. On June 10, July 15 and 29, as well as August 6, 1999, Northeast Agriculture applied a variety of pesticides, herbicides, and fungicides to the Gladstone fields. At least one such pesticide, Sev-

in®, with an active ingredient of carbaryl, has a propensity to drift.

On June 21, 1999, the Plourdes first noticed trees and shrubs on their property turning white in color. The Plourdes contacted the State of New Hampshire Department of Agriculture, and on June 24, 1999 a State inspector, Claire Nadon, investigated the Plourde farm. Nadon confirmed that vegetation was discolored and collected some vegetation and soil samples for laboratory testing. For the most part, the State's laboratory results detected no presence of any of the chemicals used on the Gladstone property in 1999. However, one area tested positive for clomozone and a trace result for a commonly-used agricultural chemical.

On the basis of her investigation, Nadon filed an administrative complaint against Twin State and Trischman. On October 27, 1999, in agreeing to a $3000 civil penalty, Twin State and Craig Trischman formally admitted to New Hampshire's allegation that "[o]n one or more of the application dates (May 29, 30, 31 and June 5, 1999) the pesticide 'Command 4 EC Herbicide,' . . . was applied in a manner which caused contamination to the . . . Plourde Farm." Paper 121, Ex. C.

#### 2. *2000*

On May 22, 2000, Trischman applied the following herbicides to Gladstone's corn crops: Banvel®, with an active ingredient of dicamba; Dual II Magnum®, with an active ingredient of S-metolachlor/benoxacor; and Princep 4L®, with active ingredients of atrazine and simazine. Evidently, Northeast Agriculture sprayed pesticides on the Gladstone fields during the 2000 growing season. *See* Paper 121, Ex. A, at ¶ 30.

---

1. Gladstone's property is located on the east bank of the Connecticut River.

On June 2, 2000, after being told by the Plourdes that trees and shrubs on their property were dying and turning yellow, Inspector Nadon returned to investigate the Plourde property. Nadon confirmed that some leaves on some of the trees were yellowed and drooping. Two vegetative samples collected on that day from two locations on the Plourde property were negative for the chemical compounds sprayed on the Gladstone property. However, a sample collected on June 20, 2000, from a windowsill of the Plourde's house directly facing the Gladstone property, reported the presence of dicamba.

Defendants' toxicological expert, Dr. Robert James, testified during his deposition as follows:

Q. Which compounds are you confident exposure occurred [during 1999 and 2000]?

A. Clomazone and dicamba.

\*   \*   \*   \*   \*   \*

Well, let me back up. . . . When I'm talking about exposure, I'm thinking significant or measurable exposure. You might argue that some immeasurable or subdetectable exposure occurred. I'm tending not to discuss that because it wouldn't be significant. I'm talking about things that might be of significance and you would evaluate.

Paper 121, Ex. B, at 91–92.[2]

B. *Daniel Plourde's Physical Condition Evaluations*

1. *Medical History Prior to the Sprayings*

Over the course of several years prior to the spraying episodes, Daniel Plourde was diagnosed by his personal physician, Dr. Lynn Durand, with the following condi-

tions or illnesses: (1) repeated bronchitis (respiratory infection), with associated persistent coughing and breathing difficulty; (2) sleep apnea, a condition where an individual stops breathing during sleep; (3) mild hypertension (*i.e.*, elevated blood pressure); (4) serotonin deficiency (*i.e.*, mild or lower-grade depression); and (5) occasional sore joints. *See* Paper 116, Ex. H. Daniel Plourde reported as a side effect of his bronchitis an occasional tendency to cough up mucosy sputum streaked with blood. Dr. Durand testified that one likely causal factor of Mr. Plourde's sleep apnea was his extra bodyweight, and that one symptom of sleep apnea is a feeling of fatigue. *See id.* at 16. Dr. Durand's notes from a February 1997 examination stated that "[a]ll of [Plourde's] life he has been somewhat stressed and he responds physically to stressful situations." *Id.* at 32. When asked to explain what he meant by that observation, Dr. Durand testified: "In other words, . . . [Mr. Plourde] would tend toward physical symptoms during times of stress. . . ." *Id.* at 33. Upon further questioning, Durand testified as follows:

Q. Generally, what are some of the ways an individual like Dan Plourde could respond physically to stressful situations?

A. Multiple ways . . . migraine headache . . . decreased weight . . . increased weight . . . back pain, muscle spasms, chest pain, angina, heart attacks . . . rashes . . . difficulty breathing . . . feeling of numbness . . . diminished memory . . . nausea.

*Id.* at 35–36.

2. *July 1999*

On July 1, 1999, Mr. Plourde visited Dr. Durand complaining of coughing accompa-

---

2. There is no suggestion by Plaintiffs that any of the herbicides or pesticides used on the Gladstone fields were not approved for agricultural use by the State of New Hampshire.

Nor is there proof that Defendants used an overly-concentrated (or insufficiently diluted) mixture of the herbicides.

nied by blood, shortness of breath upon exertion, and swelling and redness on the side of his face that was facing the Gladstone property when he was working on his farm. Plourde alleged that the symptoms were due to the clomozone sprayed on the Gladstone property. Dr. Durand later testified that Mr. Plourde's face did not appear red or swollen, and explained he could not, "to a reasonable degree of medical certainty" conclude that the symptoms Mr. Plourde *reported* having was caused by exposure to "anything, including herbicide." *Id.* at 152–53.

### 3. *June 2000*

On June 4, 2000, Mr. Plourde, after completing his morning farm chores, checked into the emergency room at a local hospital. A hospital report prepared that day stated, in relevant part:

> Patient noted left facial numbness with some question of drool on the left side of his mouth at approximately 2:00 a.m. this morning. Otherwise no complaints or symptoms. No chest pain. No shortness of breath, no nausea or vomiting. No headache, no back pain. No change in eczema. He completed his usual farm chores. He had no trouble with exertion, but appears fatigued. He went into the house and rested and reported to the ER shortly thereafter....

Paper 115, Ex. 26.

### a. *Dr. Charles Sawyer*

After Plourde was admitted to the emergency room, he was first examined by Dr. Charles Sawyer. During his October 5, 2001 deposition, Sawyer testified as follows:

> 2. [Plourde] came in complaining of tingling in the left side of his mouth, and he listed the reason that he was having this was that he was exposed to an herbicide.
>
> &ast; &ast; &ast; &ast; &ast; &ast;

He told me that he had a cow that was ill, also, that was unable to stand, and that the vet was taking care of the cow, and that I should call the vet to see what's wrong with the cow because maybe that's what's wrong with him.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. What did your exam show?

A. If you read from the note, he was awake, alert, did not appear to be in any acute distress, his ears, nose, and throat exam are essentially normal, his lungs are clear, his heart and abdomen are normal, his back was normal, his extremities were normal, his neurologic exam looked to be grossly normal, and I didn't detect any facial weakness or asymmetry in his mouth.

Q. And he wasn't drooling?

A. He wasn't drooling, that I could tell.

Paper 115, Ex. 28, at 11–12, 14.

Dr. Sawyer also examined Mr. Plourde's body and observed cracks in the skin on Plourde's forearms and back. When questioned about this observation, Sawyer explained:

Q. Does that condition bring anything to mind for you, does that condition bring anything to mind for you that might explain the dermatitis?

A. There's a whole host of things, including chemical exposure, eczema, psoriasis, medication allergy.

Q. In this case there's just no way to know?

A. It's a long laundry list.

Q. You don't have an opinion at this time, do you?

A. Uh, no.

*Id.* at 75.

However, a blood test performed at approximately 10:40 a.m. revealed elevated levels of three cardiac enzymes—creatine phosphokinase (CPK), myoglobin and troponin—a likely indication that Plourde had recently suffered an infarction or heart attack. As Dr. Sawyer explained, "since CPK is one of the cardiac markers, it made me fearful that the tingling that he had in his face could be an atypical sign of a[ ] [myocardial infarction or heart attack]." Paper 116, Ex. D, at 26. A second blood sample drawn eight hours later revealed normal levels for all the enzymes. Thereafter, the initial blood sample was retested and also indicated normal enzyme levels. Finally, the next morning (June 5), a third sample revealed normal CPK levels. Dr. Sawyer explained the significance of these tests as follows:

Q. Well, myoglobin doesn't disappear, does it, from your bloodstream?

A. None of these disappear in that quick a time.

    \*    \*    \*    \*    \*    \*

Q. So since blood enzymes don't metabolize that quickly, what that tells you as a doctor was that the first reading of the blood enzyme was incorrect?

A. Doesn't mean that it was incorrect. It just means that you have an elevated reading.

*Id.* at 34. After additional questioning, Dr. Sawyer elaborated:

Q. So the second and third [tests] were both normal?

A. Correct.

Q. And none of these enzymes disappear in that period of time, do they?

A. Not normally.

Q. So that told [you] that the second and third enzyme tests were correct and that the first one was incorrect, didn't it?

A. To the best of my ability, it would tell me that either it's instrument error or there was an interfering substance.

Q. All right. You mean the first test, what it would tell you as doctor is that the first blood test which showed the high enzymes, it was either an instrument error or something was in the blood interfering with the light transmission?

A. Correct.

Q. Okay. You don't know which?

A. No.

*Id.* at 42.[3]

When questioned about his diagnostic approach in light of Mr. Plourde's reported symptoms, Dr. Sawyer explained:

Q. Let's get back to Mr. Plourde's symptoms. Assuming that he was reporting correctly, that on the morning of June 4 he had tingling in his face and was drooling .... there are a lot of things that might have caused th[ose] condition[s]?

A. Yes.

Q. Some of them serious, some of them not so serious?

---

**3.** There is no evidence the hospital lab ever ruled out the possibility of lab error. The supervisor of the hospital lab, Elna Ilsley, later testified that the blood testing instrument used that day often failed to function properly, and was later returned to its manufacturer because of "constant" problems. *See* Paper 116, Ex. K. Moreover, when pressed to name an "interfering substance" that would cause a spiked reading and then disappear or dissolve within a nine-hour period, Dr. Sawyer stated he "cannot specifically list any substance" and admitted he never conducted an investigation as to what the substance might be. Paper 115, Ex. 28, at 62–63.

A. Correct.

Q. And you didn't go looking for any of those other things, did you?

A. We looked at the one that was the most serious, which was the heart.

Q. All right. You didn't go looking for anything else, did you?

A. We looked at potential toxic substance, and we looked at his heart.

Q. Okay, and you knew it wasn't his heart?

A. Initially, no, we didn't know it was his heart.

Q. In the end you knew it was?

A. In the end we knew it was not his heart.

Paper 115, Ex. 28, at 63–65.

In an affidavit dated June 8, 2000, less than a week after Mr. Plourde saw Dr. Sawyer in the emergency room, Dr. Sawyer swore as follows:

Based on my examination of Mr. Plourde, my discussions with Mr. Plourde's veterinarian and my review of literature concerning the chemicals that were applied to the property near the Plourde farm, in is my opinion to a reasonable degree of medical certainty that the application of these chemicals and attendant disturbance of soil containing these chemicals are the cause of Mr. Plourde's recent illness and may be the cause of the illness he has suffered since last June 1999.

Paper 5, at ¶ 7. However, in a deposition taken on July 3, 2000, evidently only one week following a second successive hospital visit by Mr. Plourde, Dr. Sawyer stated:

Q. When he [Mr. Plourde] came in to see you complaining of an asthma attack last week, you did not attribute that to herbicide?

A. I do not know.

Q. You are not sticking your head in this net and asserting an opinion [that] there is a causal relationship?

A. I am talking about it may be related because asthma attacks are prompted by environmental stresses such as colds, air pollution, any airborne irritant. Can I tell you it is your product? No, and no, I can't tell you it is not your product either.

July 3, 2000 Sawyer Deposition, at 94.

Finally, at the close of his October 5, 2001 deposition, Dr. Sawyer explained his conclusions as follows:

Q. You cannot sit here today and say with any reasonable degree of scientific or medical certainty that exposure to any herbicide caused Mr. Plourde's face to get numb, can you?

A. In the differential diagnosis of things that this could be, by his history of herbicide exposure, it becomes part of the differential diagnosis for this, and we ruled out, to the best of our ability, the other causes.

\* \* \* \* \* \*

Q. I want to know, at the end of the day, can you stand up and say, I'm a doctor, I'm board certified in family practice, I can tell you that Mr. Plourde—Mr. Plourde's facial numbness and his drooling was caused by exposure to dicamba, yes or no?

A. I can tell you that it was—it's in the list of the top few things that could cause it, and I ruled out everything else, so it makes the likelihood that it was an exposure to a product, it's not—it's not ruled out. I can't rule it in; I can't rule it out.

*Id.* at 68–69.

Significantly, there is no evidence in the record that Dr. Sawyer knew about the

chemical spraying by Northeast Agriculture. Further, Dr. Sawyer testified that Mr. Plourde's blood and urine collected on June 4, 2000 tested negative for presence of dicamba. *See id.* at 51.

### b. *Dr. Stephen H. Genereaux*

On June 4, 2000, another hospital physician, Dr. Stephen H. Genereaux, treated Mr. Plourde. Dr. Genereaux testified as follows:

Q. Did you see any abnormality with his face at all?

A. I checked his cranial nerves down on the exam part at the bottom, and they were normal, and I felt like his neurological exam was normal at that time.

Q. Did you see any drooling?

A. Not that I commented on.

Paper 115, Ex. 29, at 14. Dr. Genereaux further testified:

Q. Have you done any examination into what herbicides Mr. Plourde might have been exposed to?

A. By myself, no. I relied on, I think, the patient, and I want to say Dr. Sawyer used the—was it Command, but that information I got from other people.

Q. Okay. You don't know—do you know anything about Command?

A. No.

Q. Do you know anything about dicamba?

A. No, neither of them.

\*    \*    \*    \*    \*    \*

Q. Is it safe for me to assume, then, that you did not come to any diagnosis as to what might have caused the anomaly in the first blood test?

A. I think that's correct, because the discharge summary, I left his final diagnosis, transient elevation of myocardial enzymes.

*Id.* at 23–24.

### C. *Plourde's Livestock Health Evaluations*

The Plourdes allege a number of health problems experienced by their dairy herd in 1999 and 2000 were caused by the herbicides sprayed by Trischman on the Gladstone fields. The Plourde's own veterinarian, Dr. Walter O. Cottrell, performed blood tests on the Plourde's cows and sent 40 other biological samples to laboratories for testing. Dr. Cottrell explained the results of these tests as follows:

Q. In all those [cow] samples that you sent out, whether it was tissue samples, blood, milk or fecal samples, did any lab or pathologist ever report back to you that there was any sign of any herbicide or of any herbicide or toxicity from any herbicide?

A. No.

Paper 115, Ex. 30, at 38. In addition, on December 5, 1999, Dr. Cottrell reported his conclusions regarding the illnesses in the Plourde herd:

After exhaustive discussions with pathologists and clinicians in academia as well, the cause of illness in [Plourde cow P–12] remains undetermined. In any event, her death does not seem to be directly related, as best we can tell, to the herbicide exposure.

[F]or cow # 9, . . . we also do not think was ill as a direct result of her exposure to the drifting chemical.

The only cow who showed potentially related signs was one I treated for being unable to rise, who had mastitis, and who also had the very unusual clinical sign of cutaneous hives which we usually associate with allergic reactions. Since her illness did occur within hours of the

airborne exposure the hives are suspicious. In addition, incoordination after topical exposure is a potential cause and effect (see MSDS, # 3. Hazards Identification, Potential Health Effects). This cow was unable to stand until later that evening. A connection between the herbicide exposure and her mastitis remains unsubstantiated.

The Plourdes have asked me to comment on the possible associations between any illnesses in their animals and this uncontrolled use of herbicide. They clearly instructed me to exercise my mind but not my imagination. The down cow with hives not withstanding, there are no clear associations that I can find.

Paper 122, Ex. D.

### D. *Dr. Simon's Opinion*

Dr. Simon's May 2, 2001 Report states:

It is my opinion to a high degree of scientific probability that the misapplication of herbicides to the Gladstone fields by Craig Trischman was the toxicological cause of the property damage at the Plourde Farm, the adverse health effects of Daniel Plourde and the illnesses/deaths of cows and calves at the Plourde Farm. No other factors were shown to be consistent with or proximate to the adverse toxicological and environmental effects found at the Plourde Farm.

Paper 116, Ex. C, at 5.

In a recent affidavit responding to Defendants' claims that his opinion is not admissible, Dr. Simon explained:

I reached my opinions on causation by looking at the following factors:

a. Whether there was exposure?

b. Whether the chemicals at issue, including all of the ingredients in the chemical products, are known to or can cause the toxicological or adverse health symptoms at issue ("general causation")?

c. Whether there was a temporal relationship between the exposure and the onset of symptoms? In this case, multiple temporal relationships following the numerous sprayings of the Gladstone fields.

d. Whether all reasonable confounding factors could be eliminated?

e. Was there reliable dose information?

Paper 121, Ex. A, at ¶ 19.

Addressing "temporal relation of exposure to illness," Simon explained that the symptoms experienced by the Plourdes and their livestock within three weeks of each spraying event "is irrefutable proof that the incident chemicals used by Gladstone, drifting in an uncontrolled manner onto the Plourde properties, were the proximate causes of the of the Plourde's [sic] animal and human adverse health symptoms and problems." *Id.* at ¶ 25.

Addressing "confounding factors," Simon explained:

In reaching my opinion on causation, I carefully reviewed veterinary and clinical/medical records to eliminate all reasonable confounding variables and factors that could have caused the illnesses and the deaths. Fortunately, since the Plourde physicians and veterinarians extensively studied Mr. Plourde and his cows, much of this differential etiology had been performed. Uniformly, Mr. Plourde's doctors, who included Dr. Durand, Dr. Generaux [sic], and Dr. Sawyer, each concluded that they could find no reasonable explanation for the illness and symptoms reported by Mr. Plourde other than toxic exposure to the herbicides and pesticides at issue. I have reviewed Mr. Plourde's medical records and agree with his doctors.

\*    \*    \*    \*    \*    \*

[I]n the Plourde case, I have the benefit of the differential diagnosis performed by Dan Plourde's three treating physicians—Dr. Durand, Dr. Genereaux and Dr. Sawyer and the differential diagnosis of the Plourde's veterinarian, Dr. Cottrell. Each of those doctors excluded all causes—except toxic exposure to herbicides—for symptoms, illnesses and deaths in this case. And, none of them could exclude toxic exposure as the cause—deferring instead to a toxicologist for that conclusion.

Paper 121, Ex. A, at ¶¶ 26, 45.

Regarding the confounding factor of Mr. Plourde's history of illness, Dr. Simon explained:

The Defendants' arguments that Mr. Plourde had alleged a "history" of asthma, sinusitis and bronchitis was something I considered as a confounding factor, but consistent with the evaluation of Dr. Durand who first saw Mr. Plourde shortly after the 1999 sprayings, I concluded that he had no reactive airways disease, bronchitis or asthma problems in the period shortly before the 1999 sprayings.

Id. at ¶ 27.

Regarding the confounding factor of the chemicals sprayed by Northeast Agriculture, Dr. Simon explained:

These chemicals may have contributed to the health problems suffered by the Plourdes and their animals. However, because there is no objective evidence that these chemicals actually were detected on the Plourde Farm, I put much less weight on these chemicals as confounding causative factors. It is, however, my opinion that although the Northeast Agriculture chemicals contributed to the health problems suffered by the Plourdes and their animals, had it not been for the application of chemicals by Mr. Gladstone's agent, Mr. Trischman—especially the Command and Banvel—

the Plourde human and animal health problems and animal deaths would not have occurred.

Id. at ¶ 30.

Regarding the confounding factors in the case of the Plourdes' livestock, Simon explained:

While [Dr. Cottrell] identified the primary cause of death of many of the animals as bacterial or protozoic infections, he could not explain why the animals' immune systems could not withstand these routine barnyard pathogens.... In my opinion, it was not e-coli [sic] or other pathogens that killed the Plourde cows and calves, but that those pathogens were secondary causes of death because the cows and calves['] immune systems were severely compromised by the herbicides to which they were exposed. Many of these chemicals are known immunosuppressors.

Id. at ¶ 28.

Dr. Simon presented no estimate of the dosage or level of toxic exposure experienced by either the Plourdes or their livestock, contending that no reliable dosage information was available. For example, Simon maintains that the blood and urine samples taken from Mr. Plourde on June 4, 2000—which tested negative for presence of dicamba—were unreliable because there is no evidence regarding chain of custody over the samples, or proof that the samples were stored at an appropriate temperature prior to testing. Simon also maintains the blood and tissue samples collected by Dr. Cottrell were unreliable because they were "incomplete in terms of blood and tissue levels of herbicides." Paper 116, Ex. C, at 5.

However, Dr. Simon bases his causation opinion, at least in part, on the presence of elevated cardiac enzymes in Mr. Plourde's blood. He cites literature from the field of

toxicology finding elevated enzyme levels due to exposure to dicamba. Thus, with respect to the Defendants' charge that the elevated cardiac enzymes detected in Mr. Plourde's blood are invalid, Simon opines:

In their depositions, both Dr. Sawyer who ordered the lab tests and then double-checked with the laboratory on their validity[,] and Ms. Isley, the head technician and supervisor of the laboratory[,] affirmed the validity of the test results. Without any evidence of laboratory error it would be poor science on my part to assume there was error, especially when the two persons responsible for collecting and interpreting the data affirmed that there was no laboratory error.

Paper 121, Ex. A, at ¶ 38.

### E. *Plaintiffs' Claims*

Plaintiffs commenced this lawsuit on June 9, 2000, stating claims for fraud, conspiracy to commit fraud, intentional personal injury, battery, intentional and negligent infliction of emotional distress, nuisance, trespass, and negligence. Plaintiff Daniel Plourde alleges that as a result of Defendants' spraying of herbicides in 1999 and 2000, he suffered fatigue, rashes, chest pain, difficulty breathing, elevated blood enzyme levels, diminished memory, numbness in his face, legs and arms, drooling, nausea, coughing, headaches, and coughing of blood. Plaintiff Margaret Plourde claims that she has experienced congestion and elevated white blood cell count following the 1999 incident, as well as severe mental distress and trauma. Plaintiffs Andre and Daniele Plourde allege no direct physical injuries, but claim they suffered severe mental distress and trauma and related physical symptoms and illness in connection with that stress.

### II. *Discussion*

■ Although subject-matter jurisdiction in this case is predicated on the diversity of the parties, federal evidentiary rules control on the admissibility of an expert's opinion on injury causation. *See, e.g., McCulloch v. H.B. Fuller Co.,* 61 F.3d 1038, 1042 (2d Cir.1995); *Campbell v. Metro. Prop. & Cas. Ins. Co.,* 239 F.3d 179, 184 (2d Cir.2001); *see also Forrestal v. Magendantz,* 848 F.2d 303, 305 (1st Cir. 1988) (holding that federal evidentiary rules control on questions of admissibility of expert medical witness testimony, even in diversity cases).

■ Federal Rule of Evidence 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702 (West 2002 ed.). Rule 702 must be applied consistent with the principles of Federal Rule of Evidence 104(a). *See* Fed.R.Evid. 702, Advisory Comm. Notes, 2000 Amendments. Thus, a party seeking to present expert testimony has the burden of establishing by a preponderance of the evidence that: (1) the witness is properly *qualified* to present expert opinions on the issues or subject matter he or she plans to testify, *see Stagl v. Delta Air Lines, Inc.,* 117 F.3d 76, 81 (2d Cir.1997); (2) the principles or methodology employed by the witness in reaching an opinion are *scientifically valid* and relevant to the facts in issue, *see Campbell,* 239 F.3d at 184 (citing *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 592–93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)); and (3) the scientific principles or methods

are *properly applied* to the facts of the case, *see Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (expert opinion testimony must be excluded if "there is simply too great an analytical gap between the data and the opinion proffered"); *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir.1994).

This Court finds these evidentiary standards have not been met with respect to Dr. Simon's proffered testimony on the likely causation of Plaintiffs' injuries.

### A. *Witness Qualifications*

■ An expert may not offer an opinion on a different field or discipline. *Canino v. HRP, Inc.*, 105 F.Supp.2d 21, 27 (N.D.N.Y.2000). Indeed, in *Conde v. Velsicol Chemical Corporation*, 804 F.Supp. 972 (S.D.Ohio 1992), *aff'd* 24 F.3d 809 (6th Cir.1994), Dr. Simon was found unqualified to make a finding that the plaintiff's liver condition was *caused* by an exposure to chlordane, a toxic chemical compound, because Dr. Simon is not a medical doctor. *See id.* at 1026. *See also Goewey v. United States*, 886 F.Supp. 1268, 1281 (D.S.C. 1995) (because Dr. Simon is not a physician or one trained in diagnosing patients, his testimony that a chemical exposure was the *cause* of plaintiff's injury is insufficient to create a genuine dispute on the issue of causation); *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir.1999) (non-medical expert, a certified industrial hygienist who consults on environmental problems in occupational and residential settings, found unqualified to testify that volatile organic compounds emitted from household carpet *caused* plaintiff's illness); *In re Diet Drugs Products Liab. Litig.*, No. MDL1203, 2000 WL 962545, at *5–11 (E.D.Pa. June 28, 2000) (noting that "gaps" between available scientific data and the opinions regarding *causation* of heart dis-

ease and hypertension are "amplified" by the fact that witnesses are "not medical doctors who have treated patients"); *Mascarenas v. Miles, Inc.*, 986 F.Supp. 582, 590 (W.D.Mo.1997) ("Dr. Cummins, who is not a medical doctor, cannot evaluate or express opinions on actual possible alternate causes of plaintiff's cancer.").

■ Here, Dr. Simon intends to testify that the herbicides sprayed by Twin State caused the injuries experienced by the Plourdes and their livestock. Dr. Simon is a Registered Professional Industrial Hygienist and holds a Ph.D. in toxicology, the science of poisons. He has presented numerous academic and professional workshops and papers on forensic toxicology and industrial hygiene. He has performed industrial hygiene assessments of polluted sites, including sites exposed to pesticides. However, as observed in *Conde* and *Goewey, supra,* and confirmed here, Dr. Simon is not a medical doctor. He professes no experience or training in diagnosing and treating patients. As he conceded during his deposition:

> Now, I am not—and I state this very clearly—I'm not doing a differential diagnosis of the patient, Dan Plourde, in the way that the doctor is because I am not a doctor practicing medicine. I don't do that.... I am looking at it from the perspective of biochemical toxicity here.

Paper 116, Ex. B, at 44–43. *See also id.* at 19 ("I'm obviously not diagnosing Dan Plourde medically because I am not a medical doctor."). Nor is Dr. Simon a trained veterinarian, or experienced in treating or diagnosing illnesses in livestock. Dr. Simon fails to satisfy the "qualifications" requirement under Rule 702.

■ In addition, under Rule 703, Dr. Simon's lack of appropriate qualifications invalidates his attempt to rely on the opin-

ions of Drs. Cottrell, Durand, Genereaux, and Sawyer:

> Rule 703 permits experts to rely upon hearsay. The kind of guarantee of trustworthiness is that it be *of the kind normally employed by experts in the field.* The expert is assumed, *if he meets the test of Rule 702,* to have the skill to properly evaluate the hearsay, giving it probative force appropriate to the circumstances.

*In re "Agent Orange" Prod. Liab. Litig.,* 611 F.Supp. 1223, 1245 (E.D.N.Y.1985) (emphasis added), *aff'd* 818 F.2d 187 (2d Cir.1987). As explained by the Advisory Committee Notes accompanying Rule 703:

> Thus a *physician* in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including statements by patients and relatives, reports and opinions from nurses, technicians and other doctors, hospital records.... The *physician* makes life-and-death decisions in reliance upon them. His validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes.

Fed.R.Evid. 703, Advisory Comm. Notes, 1972 Proposed Rules (emphasis added)[4]

In this case, Dr. Simon is not a physician, but a toxicologist. He offers no proof that diagnoses and opinions offered by medical doctors and veterinarians as to causation are regularly relied upon by trained toxicologists who lack medical or veterinary training. More importantly, Dr. Simon offers no textual support for the proposition that toxicologists are qualified to evaluate the medical judgments and opinions made by doctors or veterinarians.

Moreover, it is unclear the extent to which Drs. Cottrell, Sawyer, Genereaux and Durand will be subject to cross-examination on their medical opinions in open court. If those doctors are not made available at trial,[5] Dr. Simon's opinion really amounts to nothing more than inadmissible "hearsay in disguise" under Rule 703. *See Trepel v. Roadway Express, Inc.,* 194 F.3d 708, 719, 721–22 (6th Cir.1999) (Suhrheinrich, C.J., concurring in part and dissenting in part) (citing 29 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure: Evidence* § 6273 (1997) ("Rule 703 does not authorize admitting hearsay on the pretense that it is the basis for expert opinion when, in fact, the expert adds nothing to the out-of-court statements other than transmitting them to the jury. In such a case, Rule 703 is simply inapplicable and the usual rules regulating the admissibility of evidence control.")); *United States v. Burt,* 76 F.3d 1064, 1068–69 (9th Cir.1996); *United States v. Johnson,* 54 F.3d 1150, 1157 (4th Cir.1995); *Law v. Nat'l Collegiate Athletic Assoc.,* 185 F.R.D. 324, 341 (D.Kan.1999) ("The NCAA basically presented [the expert] as a channeler, seeking to present non-expert, otherwise inadmissible hearsay through the mouth of an economist."); *State v. Towne,* 142 Vt. 241, 246, 453 A.2d 1133 (1982) (a testifying physician may not act as a mere "conduit" for another physician's opinion); *Dupona v. Benny,* 130 Vt. 281, 287, 291

---

**4.** *See also Kannankeril v. Terminix Int'l, Inc.,* 128 F.3d 802, 807 (3d Cir.1997) ("A *physician* may reach a reliable differential diagnosis without performing a physical examination, particularly if there are other examination results available; it is perfectly acceptable, in arriving at a diagnosis, for a *physician* to rely on examinations and tests performed by *other* medical practitioners.") (emphasis added).

**5.** They appear not to be offered as expert witnesses at this time, and there is no indication that they possess any skills, experience, knowledge or training regarding any of the chemicals used by Defendants apart from the information contained on product labels and Material Safety Data Sheets. *Cf. Bailiff v. Manville Forest Prods. Corp.,* 772 F.Supp. 1578, 1582 (S.D.Miss.1991).

A.2d 404 (1972) ("By his own admission [the proffered expert] was not an expert in the field of brain injury .... [and] he merely stated the conclusions of the doctors to whom he had sent the patient. Such testimony was not as to any conclusion of his own, for admittedly his training gave him no basis for coming to such conclusions.").

### B. *Scientific Validity of Proffered Testimony*

■ Even accepting that Dr. Simon is qualified under Rule 702 and is acting as more than a mere conduit for out-of-court opinion testimony, his opinions are not reliable.

A widely accepted toxicological methodology for determining the possible effects of a toxin on humans requires:

"[F]irst[,] that the expert determine the *dosage* of the toxin at issue to which the plaintiff was exposed.... Second, the expert must establish '*general causation*' by demonstrating that, according to scientific literature, levels of the toxin comparable to those received by the plaintiff can cause specific types of injuries he alleges.... Third, the expert must establish *specific causation*, by demonstrating that, more likely than not, the toxin caused plaintiff's injuries in a particular case."

Christopher H. Buckley Jr. & Charles H. Haake, *Separating the Scientist's Wheat from the Charlatan's Chaff: Daubert's Role in Toxic Tort Litigation*, 28 Envtl. L.Rep. 10, 293 (June 1998) (quoting *Mancuso v. Consol. Edison Co. of N.Y.*, 967 F.Supp. 1437, 1445–46 (S.D.N.Y.1997)) (emphasis added); *accord Mancuso v. Consol. Edison Co. of N.Y.*, 56 F.Supp.2d 391, 399 (S.D.N.Y.1999), *aff'd in relevant part* 216 F.3d 1072 (2d Cir.2000) (table); *Cavallo v. Star Enter.*, 892 F.Supp. 756, 764 (E.D.Va.), *aff'd in relevant part* 100 F.3d 1150 (4th Cir.1996); *Wintz v. Northrop Corp.*, 110 F.3d 508, 513 (10th Cir. 1997); *Lakie v. SmithKline Beecham*, 965 F.Supp. 49, 57 (D.D.C.1997); *Louderback v. Orkin Exterminating Co.*, 26 F.Supp.2d 1298, 1304 (D.Kan.1998); The Federal Judiciary Center, *Reference Manual on Scientific Evidence* 205 (1994).[6]

#### 1. *Dosage or Level of Exposure*

■ In most toxic tort cases it is impossible as a matter of practice to quantify with hard proof—such as the presence of the alleged toxic substance in the plaintiff's blood or tissue—the precise amount of the toxic substance to which an individual plaintiff was exposed. *See Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 264 (4th Cir.1999) (citing Federal Judiciary Center, *Reference Manual on Scientific Evidence* 187 (1994)); *see generally* Jean Macchiaroli Eggen, *Clinical Medical Evidence of Causation in Toxic Tort Cases: Into the Crucible of Daubert*, 38 Hous. L.Rev. 369 (2001); Laurie Alberts, Comment, *Causation in Toxic Tort Litigation: "Which Way Do We Go, Judge?"*, 12 Vill. Envtl.L.J. 33 (2001). Thus, expert testimony on toxic injuries may be admissible where dosage or exposure levels have been roughly established through reliable circumstantial evidence. *See, e.g., McCullock, supra; Zuchowicz v. United States*, 140 F.3d 381 (2d Cir.1998); *Bonner v. ISP Technologies, Inc.*, 259 F.3d 924 (8th Cir. 2001); *Westberry, supra; Curtis v. M & S Petroleum, Inc.*, 174 F.3d 661 (5th Cir. 1999); *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802 (3d Cir.1997); *Louderback*, 26 F.Supp.2d at 1306.

---

**6.** The World Health Organization, the National Academy of Sciences, and several United States Government agencies have adopted this or a nearly analogous methodology for determining the possible health effects of a toxin on humans. *See Mancuso*, 967 F.Supp. at 1445.

Where direct evidence of the precise level of toxic exposure is limited, courts have looked favorably on causation testimony that is primarily based on differential diagnosis, a scientific analysis which entails the weighing of relevant evidence, listing all likely causes of the patient's observed symptoms or injury, then eliminating all but one cause. *See, e.g., McCullock,* 61 F.3d at 1043–44; *Zuchowicz,* 140 F.3d at 385–86; *Kannankeril,* 128 F.3d at 808; *Westberry,* 178 F.3d at 262; *cf. Mancuso,* 967 F.Supp. at 1446 ("Critical to establishing specific causation is exclusion of other possible causes of symptoms.") (citing *Agent Orange,* 611 F.Supp. at 1250); *Mancuso,* 56 F.Supp.2d at 399.[7] However, courts are reluctant to admit causation testimony based on a differential diagnosis where the proffered expert possesses only weak circumstantial evidence that some exposure occurred and makes no effort to scientifically evaluate or roughly estimate the degree of exposure or dosage. *Compare Mancuso,* 967 F.Supp. at 1449 (doctor's testimony inadmissible where "he made no serious effort to evaluate dosage: doctor "rel[ied] solely" on [plaintiffs'] assertions that they had been exposed to dangerous levels of PCBs"; "ordered no special tests of plaintiffs"; "did not examine the ... site or the data on PCB levels there before opining that PCBs were the cause of plaintiffs' complaints"); *Higgins v. Diversey Corp.,* 998 F.Supp. 598, 602 n. 10 (D.Md.1997); *Cuevas v. E.I. DuPont de Nemours & Co.,* 956 F.Supp. 1306, 1312 (S.D.Miss.1997); *Schmaltz v. Norfolk & W. Ry. Co.,* 878 F.Supp. 1119, 1122 (N.D.Ill.1995), *and Chikovsky v. Ortho Pharm. Corp.,* 832 F.Supp. 341, 345 (S.D.Fla.1993), *with McCullock,* 61 F.3d at 1045 (mechanical engineer's ex-

pert testimony that plaintiff was "in the breathing zone of the hot-melt glue fumes" during plaintiff's four years of employment, coupled with plaintiff's testimony "that she and other employees could smell the unventilated glue fumes, especially when the pot overheated," is sufficient evidence as to concentration of exposure to support medical doctor's opinion on cause of plaintiff's throat polyps and withstand motion for judgment as a matter of law).

In this case, both sides acknowledge that differential diagnosis is an appropriate—if not necessary—scientific methodology in reaching an opinion on causation. *Cf. Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 155 (3d Cir.1999) (differential diagnosis is the basic method of internal medicine). The Court must now test whether Dr. Simon properly applied that methodology in arriving at his opinion.

### 2. *Differential Diagnosis*

Differential diagnosis is defined as "the process of determining which of two or more diseases with similar symptoms and signs the patient is suffering from, by means of comparing the various competing diagnostic hypotheses with the clinical findings." Mary Sue Henifin, *et al.,* "Reference Guide on Medical Testimony," in *Reference Manual on Scientific Evidence* 481 (2d ed.2000).

As a preliminary matter—and contrary to Dr. Simon's assertion—there is no evidence Drs. Cottrell, Genereaux or Durand offered *any* opinion that could be used to make an inference as to causation. Dr. Cottrell evidently performed some diagnostic techniques, but he does not purport to exclude all other likely possible causes

---

**7.** In addition, according to the Second Circuit, if a qualified expert performs a reliable differential diagnosis, the plaintiff need not satisfy the general causation requirement. *See McCullock,* 61 F.3d at 1044 (explaining

that "lack of textual authority" on the issue of general causation "go[es] to the weight, not the admissibility" of an expert opinion, where other reliable indicia of causation are present).

except for exposure to herbicides. In short, Dr. Simon's opinion cannot fairly rely on any of these doctors' opinions.

Dr. Sawyer comes closer to stating an opinion supporting Dr. Simon, but his opinion is lacking in proof. First, the initial, elevated cardiac enzyme test taken from Mr. Plourde is more likely than not unreliable; Dr. Sawyer and the hospital's lab technician expressed serious doubt as to its validity in light of further testing.[8] Second, the numerous medical examinations by Sawyer and others confirmed few, if any, of the numerous symptoms Daniel Plourde alleged he suffered due to exposure. Reliance on patient statements to render a medical opinion is usually justified, *see Agent Orange*, 611 F.Supp. at 1246, but in this case there is no evidence Dr. Sawyer took into account confounding factors such as Mr. Plourde's extensive medical history or the Northeast Agriculture sprayings.[9] *Cf. Mascarenas v. Miles, Inc.*, 986 F.Supp. 582, 589 (W.D.Mo.1997) (testimony inadmissible since "[t]he most that can be said from plaintiff's argument is that he was sprayed with *some* pesticide in the Rio Grande Valley"); *Agent Orange*,

611 F.Supp. at 1250 (finding plaintiffs' case inadequate where they could not rule out other possible causes such as their service in Vietnam). Moreover, in contrast to the medical doctor in *McCullock*, there is no evidence Dr. Sawyer based his opinion on an objective showing that Mr. Plourde was in an "exposure zone" for any period of time.[10] Finally, though Dr. Sawyer cites his discussions with Dr. Cottrell regarding the Plourde livestock as additional proof or confirmation of his conclusion regarding the cause of Mr. Plourde's symptoms, *see* Paper 5, at ¶¶ 6–7, neither Dr. Simon nor Dr. Sawyer offer textual support for the use of animal symptoms associated with exposure to dicamba as reliable data in determining the cause of symptoms observed in humans, particularly where dosage levels are wholly unknown. *Cf. Agent Orange*, 611 F.Supp. at 1241; *Paoli R.R. Yard PCB Litig.*, 35 F.3d at 748–49; *Siharath v. Sandoz Pharm. Corp.*, 131 F.Supp.2d 1347, 1366–67 (N.D.Ga.2001); *Hall v. Baxter Healthcare Corp.*, 947 F.Supp. 1387, 1410–11 (D.Or.1996).[11]

■ This Court cannot admit an expert opinion that is "connected to existing data

8. Furthermore, on the matter of objective tests, Dr. Simon cannot have it both ways. He offers no reason why his implicit trust of the initial enzyme test at the hospital should not carry over with respect to the numerous tests performed by Dr. Cottrell (the Plourdes' own veterinarian), or the blood and urine tests taken June 4, 2000 that detected no dicamba in Mr. Plourde.

9. Dr. Sawyer was not even aware of these additional sprayings or of the type of chemicals used by Northeast Agriculture. This problem is compounded when one considers Dr. Simon's concession that many of the symptoms found in the Plourdes and their livestock are "likely" to also have been caused by the Northeast Agriculture sprayings.

10. Dr. Simon has made no attempt to estimate or evaluate the likely degree of exposure, and his suggestion that Defendants' expert, Dr. James, concedes the exposure was

"significant" is not supported by a fair reading of his deposition testimony. The most that can be said on the basis of the New Hampshire test data—and all Dr. James did in fact concede—is that some measurable amount of dicamba and clomozone drifted onto the Plourde property. *See also* Paper 121, Ex. C (Defendants admitting to "contamination" without specifying degree, amount, or duration).

11. In the end, without reliable, admissible medical doctors' opinions, or even rough estimates on levels of exposure, Dr. Simon's opinion stands mostly on the temporal relationship between alleged exposure and the onset of the reported symptoms. *Cf. Cuevas*, 956 F.Supp. at 1312; *Cartwright v. Home Depot U.S.A., Inc.*, 936 F.Supp. 900 (M.D.Fla. 1996); *Cavallo*, 892 F.Supp. at 756.

by the *ipse dixit* of the expert." *Joiner,* 522 U.S. at 146, 118 S.Ct. 512. "If the underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion which rests entirely upon them must be excluded." *Agent Orange,* 611 F.Supp. at 1245. Accordingly, Dr. Simon's testimony as to causation must be excluded.

### III. *Conclusion*

For the reasons set forth above, it is hereby ORDERED, that Defendants' Motion to Exclude Testimony of Dr. Robert K. Simon is GRANTED.

Consistent with the Court's Order dated February 20, 2002, Plaintiffs shall file their response to Defendants' Joint Motion for Summary Judgment (Paper 113) within 15 days of receipt by their counsel of this decision. In light of the Court's decision to exclude Dr. Simon's testimony, Plaintiffs are requested to address in their response:

1. Whether New Hampshire law should control the determination of Plaintiffs' causes of action;

2. If so, whether causation is a required element in Plaintiffs' causes of action (state which); and

3. If so, whether expert testimony is necessary to prove the element of causation with respect to each respective cause of action. *See, e.g., Smith v. Penn Tank Lines,* No. Civ. 00–220–JD, 2001 WL 575101, at *2 (D.N.H. May 29, 2001) (unpublished order) (citing *Lemay v. Burnett,* 139 N.H. 633, 635, 660 A.2d 1116, 1117 (1995)).